Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
Lesley F. Portnoy (SBN 304851)
Charles Linehan (SBN 207439)
Pavithra Rajesh (SBN 323055)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMO DUVNJAK, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>BOX, INC., AARON LEVIE, and DYLAN SMITH,<br><br><br>        Defendants. | Case No. 4:19-cv-03173-PJH<br><br>**AMENDED CLASS ACTION COMPLALNT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

1

Lead Plaintiffs Simo Duvnjak, Wayne Judd, and Kathy Judd ("Plaintiffs"), by their undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Box, Inc. ("Box" or "Company"), analysts' reports and advisories about the Company, interviews with former employees of the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Box from November 28, 2018 through June 3, 2019, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.      Throughout the Class Period, Defendants Box, Aaron Levie ("Levie"), its Chief Executive Officer ("CEO"), Co-founder, and Chairman, and Dylan Smith ("Smith"), its Chief Financial Officer ("CFO") and Co-founder, made materially false and misleading statements about the sales cycles and expected closings of the Company's seven-figure deals. Additionally, Defendants issued guidance to investors that was not supported by facts about their sales cycles that they knew at the time.

3.      Box provides a cloud content management platform to its clients, who use its applications to manage complex and dynamic operating environments. Box focuses on the enterprise market and works with 70% of Fortune 500 companies.

4.      In addition to its consolidated financial statements, which it prepares in accordance with Generally Accepted Accounting Principles ("GAAP"), Box provides investors with other performance measures. One of the most important is its billings, which Box has consistently described to investors as a leading indicator of future revenue.

5.      On November 28, 2018, Defendants announced the Company's financial results for the third quarter of fiscal year 2019 ("FY2019"),[1] ended October 31, 2019, reporting revenue growth and disclosing that it was on track to deliver its first quarter of non-GAAP profitability in the fourth quarter of FY2019.

_____
[1] Box's fiscal year ends January 31.

6. On a conference call with analysts held on the same day ("November 28 Earnings Call"), Defendants Levie and Smith provided guidance for billings growth in the fourth quarter of FY2019. Defendant Smith stated that "we continue to expect Q4 calculated billings growth to be in the mid-20% range" year-over-year. Defendant Levie elaborated that Defendants were confident about billings growth because they had already seen a significant shift in the Company's sales strategy towards bundled solutions in the third quarter of FY2019 that they expected to continue in the next quarter. Touting stronger visibility in the fourth quarter pipeline Smith expressed bolstered confidence in the outlook for billings, conveying his expectation that deals would show up in the Company's fourth quarter billings.

7. On February 27, 2019, however, the Company issued a press release, reporting fourth quarter billings of $237.7 million, up 16% year-over-year, falling materially short of the 20% guidance that they had provided on November 28. To explain the failure, Defendants cited underperformance in the Europe, Middle East and Africa ("EMEA") market and longer sales cycles for some seven-figure deals.

8. In the February 27, 2019 press release, Defendants also provided guidance for the 2020 fiscal year ("FY2020"), telling investors that the Company expected revenue in the range of $700 million to $704 million, GAAP basic and diluted net loss per share in the range of $1.06 to $1.02, non-GAAP basic and diluted net loss per share in the range of $0.03 to $0.01, and weighted average basic

4

and diluted shares outstanding of approximately 148 million and 146 million, respectively.

9.     On a conference call with analysts held on the same day, Defendants Levie and Smith attempted to explain the Company's failure to meet expectations for its billings for the quarter. Levie told investors that the Company underperformed against its expectations for seven-figure deals in the quarter, because these more complex deals were taking longer to close than planned. He also explained that the fourth quarter saw a greater impact from the Company's weakness in EMEA than Defendants had anticipated. Defendants told investors that the seven-figure deals were all still in the Company's pipeline, and that they expected the majority to close in the first half of FY2020.

10.     Smith explained that Box's guidance for FY2020 incorporated the impact of the Company's underperformance in EMEA and seven-figure deal execution in the fourth quarter of 2019, with each representing approximately a $10 million headwind to the annual revenue versus their previous expectations. He also disclosed that one of the Company's customers significantly reduced its spend with Box upon its renewal earlier in February, representing an additional headwind of approximately $8 million in the coming fiscal year.

11.     On this news, the Company's share price fell $4.64, or nearly 19%, to close at $20.24 on February 28, 2019, on unusually heavy trading volume.

5

12.     On June 3, 2019, after the market closed, the news got worse. Box lowered its fiscal 2020 revenue outlook to a range of $688 million to $692 million, from previous guidance of $700 million to $704 million, again citing longer sales cycles for its seven-figure deals.

13.     On this news, the Company's share price fell by $0.75, or more than 4%, to close at $17.18 per share on June 4, 2019, on unusually heavy trading volume.

14.     Throughout the Class Period, Defendants misled investors, setting expectations for billings that they knew the Company could not meet due to longer sales cycles for seven-figure deals and problems in its ability to close sales in EMEA. As a direct and proximate result of their knowing or reckless material misstatements and omissions, Plaintiffs and the Class have suffered damages.

## II.   <u>JURISDICTION AND VENUE</u>

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as the Company conducts business and maintains an office in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

III.    **PARTIES**

19.     As listed in their Certifications, filed with their Lead Plaintiff Motion in this case (ECF No. 10-2), incorporated herein by reference in its entirety, Lead Plaintiffs Simo Suvnjak, Wayne Judd, and Kathy Judd acquired Box securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant Box provides a cloud content management platform to its clients, who use its applications to manage complex and dynamic operating environments. Box is a Delaware corporation with its headquarters located at 900 Jefferson Avenue, Redwood City, California 94063. Box securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BOX."

7

21.    Defendant Levie was the Company's CEO throughout the Class Period, as well as Box's co-founder and chairman.

22.    Defendant Smith served as the Company's CFO throughout the Class Period. He is also a co-founder of Box and a member of the Company's Board of Directors.

23.    Defendants Levie and Smith are sometimes referred to herein as the "Individual Defendants."

24.    Each of the Individual Defendants:

a.  directly participated in the management of the Company;

b.  was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

8

f.  approved or ratified these statements in violation of the federal

securities laws.

25.   Box is liable for the acts of the Individual Defendants and its

employees under the doctrine of *respondeat superior* and common law principles

of agency as all of the wrongful acts complained of herein were carried out within

the scope of their employment with authorization.

26.   The scienter of the Individual Defendants and other employees and

agents of the Company is similarly imputed to Box under *respondeat superior* and

agency principles.

27.   Defendant Box and the Individual Defendants are referred to herein,

collectively, as the "Defendants."

IV.   **BACKGROUND**

28.   Box describes itself as a leading enterprise content platform. The

Company's quarterly report for the period ended October 31, 2018, filed on Form

10-Q with the SEC on December 6, 2018 described Box as providing "a leading

cloud content management platform that enables organizations of all sizes to

securely manage cloud content while allowing easy, secure access and sharing of

this content from anywhere, on any device." Box's customers can upload files to

the Company's servers and give multiple users the right to view and edit shared

files. The Company's clients include 70% of Fortune 500 companies, including

9

AstraZeneca, General Electric, JLL, and Nationwide. Box's competitors include Microsoft, Google, and Dropbox.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

29.   On November 28, 2018, Box issued a press release announcing its financial results for the third quarter of FY2019.

30.   In the November 28 press release, Defendants stated that billings are an important performance measure for the Company because they are a leading indicator of future revenue, explaining:

> Billings reflect, in any particular period, (1) sales to new customers, plus (2) subscription renewals and (3) expansion within existing customers, and represent amounts invoiced for all products and professional services. Box calculates billings for a period by adding changes in deferred revenue and contract assets in that period to revenue. Box believes that billings help investors better understand sales activity for a particular period, which is not necessarily reflected in revenue as a result of the fact that Box recognizes subscription revenue ratably over the subscription term. Box considers billings a significant performance measure and, after adjusting for any shifts in relative payment frequencies, a leading indicator of future revenue. Box monitors billings to manage the business, make planning decisions, evaluate performance and allocate resources. Box believes that billings offers valuable supplemental information regarding the performance of the business and will help investors better understand the sales volumes and performance of the business. Although Box considers billings to be a significant performance measure, Box does not consider it to be a non-GAAP financial measure

given that it is calculated using exclusively revenue, deferred revenue, and contract assets, all of which are financial measures calculated in accordance with GAAP.

31.     Accordingly, in the November 28 Earnings Call, Defendants Levie and Smith discussed the Company's billings expectations for the fourth quarter of FY2019 in detail. Smith set expectations high, explaining that the Company expected most of the large deals it had contracted earlier in the year to close in the fourth quarter, driving significant billings growth:

> This year, we've been seeing an increase in large deal volumes as well as higher add-on product attach rates associated with increasingly robust Box implementations. As we've been mentioning throughout the year, we've been expecting most of these larger deals to close later in the year, predominantly in Q4. ***As such, we continue to expect Q4 calculated billings growth to be in the mid-20% range.***

(Emphasis added.)

32.     Defendants' guidance to investors to expect billings growth in the fourth quarter of FY2019 to be in the mid-20% range year-after-year was materially misleading because Defendants knew that the Company could not close the complex seven-figure deals that would enable it to meet that expectation in the fourth quarter of FY2019.

11

33.     Echoing Smith's guidance on billings, Levie answered an analyst's question about what gave him confidence that the Company could meet the stated expectation of 20% growth in billings year-over-year by explaining:

> So as we noted at the beginning of the year, we, in FY '19, really wanted to evolve how we were selling to customers. And instead of going in, really talking about file sharing and collaboration, starting to change the conversation around content management and powering more and more business processes for our customers. And while that took a couple of quarters to roll through our sales motion, we think that you're now starting to see that show up in a much more significant way. Q3, I think, is the first major quarter of evidence of that when you look at our large deal traction of, again, 40% growth in the 100k segment, 120% growth in the 500k segment, 200% in the $1 million segment…And we think that's going to continue to show up in Q4 and, obviously, be an incredibly important fixture of how we sell going forward into the future. And then one other note I would just say is we have been seeing more and more customer -- we've been seeing more customer into Q4, but really important in FY '20, and making sure that we can deliver sort of a bundled solutions or a suites as it were of our add-on products that come together. So customers don't have to buy sort of one at a time, but you can actually get the full power of Box in one transaction. So that -- we have a lot of learnings this year that we think are going to be baked into our sales motion going into the future. And the nice benefit of this is not only does it do things like grow our average contract value and deal size, it actually improves our competitiveness from a win rate standpoint because it bolsters Box's core differentiation as really being a cloud content management platform.

34.     Defendants' guidance to investors to expect billings growth in the fourth quarter of FY2019 to be in the mid-20% range year-after-year was materially misleading because Defendants knew that the Company could not close the complex seven-figure deals that would enable it to meet that expectation in the subsequent quarter.

35.     Responding to a question about what gave him confidence in Defendants' fourth quarter outlook for billings, Smith stated:

> [A]s we get closer now, we're in the fourth quarter, ***we have stronger visibility and confidence in that Q4 pipeline.*** But it's really, as a reminder, the confluence of a lot of the pipeline that we've been generating throughout the year, especially as these solution selling motions have sort of rolled. Many of those deals are showing up in Q4, which is why we've said, throughout the year, we expect this year to be more back end loaded than we've seen in past years, so really same drivers. Just with the passage of time, that confidence has increased.

(Emphasis added.) By touting visibility and confidence in the Company's pipeline for billings for the fourth quarter of FY2019, Smith showed that he and Levie were closely monitoring deals with Box's larger customers.

36.     Smith's statement that greater visibility into the fourth quarter of FY2019 provided confidence in Box's fourth quarter outlook for billings was materially misleading because Defendants knew that the Company could not close

13

the complex seven-figure deals that would enable it to meet that expectation in the fourth quarter of FY2019.

## VI.   THE TRUTH BEGINS TO EMERGE, AS DEFENDANTS CONTINUE TO MAKE FALSE STATEMENTS

37.    On February 27, 2019, the Company issued a press release reporting fourth quarter billings of $237.7 million, up 16% year-over-year. This performance fell materially short of the 20% expectation that they had set on November 28. To explain the failure, Defendants cited underperformance in the EMEA market and longer sales cycles for some seven-figure deals.

38.    The Company's February 27, 2019 press release also provided guidance for FY2020, disclosing expected revenue in the range of $700 million to $704 million, GAAP basic and diluted net loss per share in the range of $1.06 to $1.02, non-GAAP basic and diluted net loss per share in the range of $0.03 to $0.01, and weighted average basic and diluted shares outstanding of approximately 148 million and 146 million, respectively.

39.    The Company's guidance was materially misleading because Defendants knew that their inability to timely close seven-figure deals and the loss of material business from a large customer rendered it unable to meet it.

40.     On a conference call with analysts held on the same day (the "February 27 Earnings Call"), Defendants Levie and Smith explained the Company's failure to meet expectations for its billings for the quarter. Smith stated:

> Fourth quarter billings came in at $237.7 million, representing 16% calculated and 17% adjusted billings growth year-over-year, falling short of our original expectation of growth in the mid-20s. As Aaron mentioned, this outcome was the result of some 7-figure deals that are taking longer to close than we had expected and our disappointing execution in EMEA.

41.     Later on the February 27 Earnings Call, Levie stated that the seven-figure deals that the Company failed to close were in the pipeline for the year, admitting a longer sales cycle than the one that Defendants had told investors to expect on November 28, 2018. Specifically, Levie told analysts:

> We're again not happy, I'm not satisfied with the Q4 results in the big deal segments, especially the 7-figure deals. However, those customers are still in the pipeline for this year. Tend to be very large, regulated customers, often in banking or government agencies or life sciences where the deals tend to be more complex in nature from a security, legal, compliance standpoint. But overall, we have not changed our view of the momentum and the pipeline that we're seeing in the business.

42.     Levie went on to explain the reasons for the complexity of the Company's seven-figure deals by providing a list of issues that are all foreseeable when working on a transaction with certain customers, stating:

15

[U]nfortunately, due to the complexity of some of these transactions, there's – some of that is not fully within our control. I'd say due to the kinds of customers we're talking about where the intellectual property that's within their files and their data is very sensitive, could be client records, could be government data and information, it just puts a very high threshold on the security review, the compliance review, the data privacy reviews of our customers, which often involves a pretty broad set of individuals and parts of the organization that we have to go and work through. And then, of course, obviously, as always, budgeting and kind of finance decisions as well in that process. So the complexity of these deals, obviously, has increased over the past couple of years, really driven by the strategic nature of these transactions.

43.     Defendants told investors, however, to expect the seven-figure deals that they had failed to close in the previous quarter to close in the first half of FY2020. Levie stated:

But that 7-figure category, we are not happy about those results. We're seeing those 7-figure deals in both our Q1 and Q2 pipeline, so we have a high degree of confidence that we'll get the majority of those things closed throughout the next couple of quarters into Q3. And that's where we'll see these deals show up.

44.     Levie's statement was materially misleading because Defendants knew that the seven-figure deals that the Company had failed to close during the fourth quarter of FY2019 would actually close not in the first and second quarters of FY2020, but during the second half of the year.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. 4:19-CV-03173-PJH

45.     Smith also explained that the fourth quarter saw a greater impact from the Company's weakness in EMEA than Defendants had guided investors to expect, with results significantly down year-on-year in terms of productivity.

46.     Defendants also stated on the February 27, 2019 Earnings Call that Box's guidance for FY2020 incorporated the impact of the Company's underperformance in EMEA and seven-figure deal execution in the fourth quarter of FY2019, with each representing approximately a $10 million headwind to the annual revenue versus their previous expectations. They also disclosed that one Box customers had significantly reduced its spend earlier in the month, representing an additional headwind of approximately $8 million in the coming fiscal year.

47.     Similarly, on a Morgan Stanley Technology, Media & Telecom Conference call held the following day, Smith was explicit that the Company's underperformance in seven-figure deal execution and EMEA, as well as a large customer downgrading its deployment, was incorporated into Box's guidance for FY2020, stating:

> So all of the factors, these 3 main buckets, are all incorporated into the guidance that we gave last night. And there's the 2 areas that we have talked about, both the 7-figure deal execution as well as EMEA underperformance, each of which contributed to roughly $10 million headwind or to a $10 million impact to our FY '20 guidance versus our prior expectations. And then that large customer downgrading their deployment has another roughly $8 million impact to our FY '20

17

guidance. And as it relates to the larger deals that we didn't ultimately close in Q4, most of those are still in the pipeline and set to close throughout the course of FY '20. Given some of the challenges and complexities with those deals and the fact that we've seen, in certain areas, the solution selling is taking a little bit longer to roll out and see success than we had originally expected, we did want to take a pretty prudent approach to our expectations around when those deals will close. **But it is all -- those are incorporated into our guidance.**

(Emphasis added.)

48.     Levie then emphasized that "to be clear, not a single [deal] has been lost to any competitor or pushed out of the pipeline."

49.     Defendants' statements that Box's guidance incorporated the Company's underperformance in seven-figure deal execution and EMEA, as well as the loss of revenue from a large customer downgrading its deployment were materially misleading because Defendants knew that these headwinds, which they already knew about at the time that they provided investors with guidance for FY2020, were not in fact sufficiently accounted for in Box's guidance.

50.     On the news that Box had failed to meet its expectations for billings growth and had materially understated the sales cycle for seven-figure deals, the Company's share price fell $4.64, or nearly 19%, to close at $20.24 on February 28, 2019, on unusually heavy trading volume

18

VII. **THE TRUTH EMERGES**

51.     On June 3, 2019, after the market closed, Box issued a press release lowering its fiscal 2020 revenue outlook to a range of $688 million to $692 million, from previous guidance of $700 million to $704 million. The Company changed its expected GAAP basic and diluted net loss per share to the range of $1.05 to $1.03, its non-GAAP basic and diluted net loss per share to the range of $0.00 to $0.02, and its weighted average diluted shares to approximately 155 million.

52.     On an earnings call held on the same day, Defendants Levie and Smith attributed the adjustment to the Company's guidance to – once again – longer sales cycles for seven-figure deals. Smith told analysts that "[I]n light of our anticipation of longer sales cycles across our larger deals, we now expect revenue to be in the range of $688 million to $692 million."

53.     Melissa Franchi of Morgan Stanley questioned whether Defendants' ascribing the adjustment to guidance to longer sales cycles for large deals meant that the sales cycles had become even longer, asking Levie, "Aaron, when we spoke last quarter, you talked about elongating sales cycles and some deals that had slipped from Q4. Coming into Q1, did the sales cycle elongate further than what you saw last quarter?" Levie responded that it did not:

> So overall, I think we're seeing a really strong pipeline
> buildup throughout the year with pretty clear kind of close
> dates in a very measurable way across the business. So I

19

> don't know that we're seeing an increase in the sales cycle length from where we were 3 months ago. I think we're just getting a better sense for it overall, though, as it relates to the financial model this year.

In other words, Levie admitted that Defendants had already known the length of the Company's sales cycles for longer deals when they first issued guidance on February 27, 2019, and when they told investors that they expected such deals to close during the first half of FY2020. In fact, Defendants later admitted on August 28, 2019, when they held an earnings call in connection with the release of the Company's financial statement for the second quarter of 2020, that seven-figure deals generally close in the second half of the year. Accordingly, Defendants' June 3, 2019 downgrade to the Company's guidance demonstrates that this information did not support the guidance as originally issued.

54.   On this news, the Company's share price fell by $0.75, or more than 4%, to close at $17.18 per share on June 4, 2019, on unusually heavy trading volume.

55.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiffs and other Class members have suffered significant losses and damages.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. 4:19-CV-03173-PJH

1

## VIII.  PLAINTIFF'S CLASS ACTION ALLEGATIONS

2

3

4

5

6

7

8

9

10

11

12

56.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Box securities publicly traded on NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

57.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Box securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Box or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

58.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Box;

c.     whether the Individual Defendants caused Box to issue false and misleading statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

22

e.   whether the prices of Box securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

62.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   Box securities are traded in an efficient market;

d.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.   the Company traded on NYSE and was covered by multiple analysts;

23

f.     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.     Plaintiffs and members of the Class purchased, acquired and/or sold Box securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

64.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and

### Rule 10b-5 against All Defendants

65.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

66.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Box securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Box securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other

25

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Box securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Box.

69.   By virtue of their positions at Box, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Box securities from their personal portfolios.

71.   Box showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As

the senior managers and/or directors of Box, the Individual Defendants had knowledge of the details of Box's internal affairs.

72.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Box. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Box's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Box securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Box's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Box securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     During the Class Period, Box securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the

market, purchased or otherwise acquired shares of Box securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Box securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Box securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

74.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

1

## COUNT II

2

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

3

4       76.    Plaintiffs repeat and reallege each and every allegation contained in

5   the foregoing paragraphs as if fully set forth herein.

6

7       77.    During the Class Period, the Individual Defendants participated in the

8   operation and management of Box, and conducted and participated, directly and

9   indirectly, in the conduct of Box's business affairs. Because of their senior

10  positions, they knew the adverse non-public information about Box's current

11  financial position and future business prospects.

12

13      78.    As officers and/or directors of a publicly owned company, the

14  Individual Defendants had a duty to disseminate accurate and truthful information

15  with respect to Box's business practices, and to correct promptly any public

16  statements issued by Box which had become materially false or misleading.

17

18      79.    Because of their positions of control and authority as senior officers,

19  the Individual Defendants were able to, and did, control the contents of the various

20  reports, press releases and public filings which Box disseminated in the marketplace

21  during the Class Period concerning the Company's business, operational and

22  accounting policies. Throughout the Class Period, the Individual Defendants

23  exercised their power and authority to cause Box to engage in the wrongful acts

24

25

26

27

28

complained of herein. The Individual Defendants therefore, were "controlling persons" of Box within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Box securities.

80.    Each of the Individual Defendants, therefore, acted as a controlling person of Box. By reason of their senior management positions and/or being directors of Box, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Box to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Box and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

81.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Box.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

1

2

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

3

4

5

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

6

7

8

9

D.      Awarding such other and further relief as this Court may deem just and proper.

10

11

X.      **DEMAND FOR TRIAL BY JURY**

12

Plaintiffs hereby demand a trial by jury.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

Dated:   November 13, 2019                Respectfully submitted,

                                          **GLANCY PRONGAY & MURRAY
                                          LLP**

                                          /s/ *Lesley F. Portnoy*
                                          Lionel Z. Glancy
                                          Robert V. Prongay
                                          Lesley F. Portnoy
                                          Charles Linehan
                                          Pavithra Rajesh
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone: (310) 201-9150
                                          Facsimile: (310) 201-9160
                                          Email: info@glancylaw.com

                                          **THE ROSEN LAW FIRM, P.A.**

                                          /s/ *Laurence M. Rosen*
                                          Laurence M. Rosen, Esq. (SBN 219683)
                                          355 South Grand Avenue, Suite 2450
                                          Los Angeles, CA 90071
                                          Telephone: (213) 785-2610
                                          Facsimile: (213) 226-4684
                                          Email: lrosen@rosenlegal.com

                                          ***Co-Lead Counsel for Plaintiffs and Class***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071.  I am over the age of eighteen.

On November 13, 2019, I electronically filed the following **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on November 13, 2019.


/s/ *Laurence M. Rosen*
Laurence M. Rosen